**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ELVIS IRIZARRY, : | |
| : | |
| Petitioner, : | Civil Action No. 05-0033 (JAG) |
| : | |
| v. : | **O P I N I O N** |
| : | |
| UNITED STATES OF AMERICA, : | |
| : | |
| Respondent. : | |

**GREENAWAY, JR., U.S.D.J.**

Petitioner Elvis Irizarry ("Petitioner" or "Irizarry") has filed the instant pro se petition

seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2255 ("§ 2255").[1]  Petitioner contends

that his sentence should be vacated or corrected.  Petitioner claims that he was deprived of his

sixth amendment right to effective assistance of counsel.  For the reasons set forth below, the

petition is denied.

---

[1] 28 U.S.C. § 2255 provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of
> Congress claiming the right to be released upon the ground that the
> sentence was imposed in violation of the Constitution or laws of the
> United States, or that the court was without jurisdiction to impose
> such sentence, or that the sentence was in excess of the maximum
> authorized by law, or is otherwise subject to collateral attack, may
> move the court which imposed the sentence to vacate, set aside or
> correct the sentence.

## BACKGROUND

On December 5, 2001, a federal grand jury in the District of New Jersey returned a seven-count indictment charging Petitioner with: (1) Racketeering Conspiracy; (2) Racketeering; (3) Conspiracy to Distribute Cocaine; (4) Conspiracy to Collect Debts by Means of Extortion; (5) Arson Affecting Interstate Commerce; (6) Murder in Aid of Racketeering; and (7) Using, Carrying and Discharging a Firearm During the Course of a Violent Felony.  (Answer to Petition ("Ans."), at 1.)  At trial, Petitioner took the stand and testified despite his attorneys' requests to the contrary.  (Pet'r's Mem. of Law ("Pet'r's Mem."), at Ex. 4.[2])  After a four week long trial, in which over sixty witnesses testified, Petitioner was found guilty of all seven counts of his indictment, and of twelve separate racketeering acts.[3]  Petitioner was thereafter sentenced to three life terms plus 85 years in prison.[4]  (Ans. 1-2.)  This sentence is the subject of the instant petition.

At trial, the Court determined that Petitioner was a member of a criminal organization

---

[2] Petitioner refers to his exhibits as appendices ("App.") and documents ("Doc") in his Memorandum of Law and in his Reply; however, for purposes of clarity this Court shall refer to these attachments as exhibits ("Ex.").

[3] As part of the Racketeering and Racketeering Conspiracy Counts, the jury found Petitioner guilty of twelve racketeering acts: (1) the murder, conspiracy to murder, and attempt to murder Giancarlo Ravasi; (2) the murder of Joseph Marmora; (3) the murder of Antonio Pavone; (4) the murder of Kyle Veale; (5) the arson, and conspiracy to commit arson of a car used during the Marmora/Pavone double homicide; (6) conspiracy to commit armed robbery of an armored car; (7) the armed robbery, and attempted robbery of the proprietor of Tommy's Delicatessen; (8) conspiracy to distribute cocaine; (9) collecting debts by means of extortion; (10) the arson of a residence on Belvidere Avenue; (11) the arson of a residence on Sherman Avenue; and (12) the murder of Jose Ruiz.  (Ans. 1.)

[4] In response to Petitioner's attempt to obstruct justice, Judge Nicholas H. Politan increased Petitioner's sentencing range by two levels.  (Ans. 27.)

("the organization") operating out of Jersey City, New Jersey.  U.S. v. Irizarry, 341 F.3d 273, 279 (3d Cir. 2003).  The following facts are a brief summary of Irizarry's involvement with the organization.  The leader of the organization, Franco Durso ("Durso"),[5] had final say over Irizarry's and other organization members' ("the crew") actions.  Id.  Petitioner was a member of the organization for a seven year period, during which time he participated in "murder, arson, armed robbery, drug trafficking, and the extortionate collection of debts."  Id.  At trial, Durso testified that he would call on Irizarry "if anything needed to be done as far as . . . persuad[ing] people to do things, [or] to get something done."  Id.  Durso, Irizarry, and the crew answered to Massimo Ranieri ("Ranieri") in Jersey City.  Id.  Ranieri was based in Brooklyn, New York, and thought to be next in line to take control of the Sicilian wing of the Gambino crime family.  Id.

Irizarry helped generate income for the organization through loansharking.  Irizarry, 341 F.3d at 279.  Durso loaned out money, and if he was not repaid, Irizarry was sent to collect it.  Id.  In order to "intimidate people" during his collection rounds, Irizarry often took members of the crew along with him.  Id.  Irizarry and the crew used violence to control problematic situations.  Id.  In one instance, Irizarry attempted to collect money from John Yengo ("Yengo") at a local bar.  Id.  Irizarry took Yengo to the bathroom to "talk" while a fellow crew member, Raymond Looney ("Looney"), waited outside.  Id.  At trial, Looney testified that he "heard a commotion" in the bathroom, and when he entered the bathroom he saw Irizarry hit Yengo over the head with a hammer.  Irizarry, 341 F.3d at 279-80.  Looney further testified that Irizarry continued to hit Yengo, and Yengo responded by immediately taking money out of his pocket, and handing it to

---

[5] Durso was Petitioner's co-defendant; however, he pleaded guilty pre-trial and was thereafter deported to Italy.

Irizarry.[6]  Id. at 280.

Irizarry also aided the organization in generating income by other means.  Id.  For example, Irizarry participated in a drug trafficking scheme which involved purchasing cocaine in New York and transporting it back to New Jersey.[7]  Id.  In addition, in an attempt "to build a reputation for himself," Irizarry initiated several armed robbery schemes on his own to generate additional funds for the organization.[8]  Id.  On one occasion, Irizarry hand-picked members of the crew for an armed robbery of an armored truck delivering money to the Kingsbrook Jewish Medical Center in Brooklyn, New York.  Id.  Irizarry and his chosen crew had lengthy discussions regarding the robbery, and eventually arranged for the necessary transportation to complete it.  Irizarry, 341 F.3d at 281.  Durso, however, called the robbery off at the last minute because Irizarry's crew members expressed concern regarding how dangerous the operation was.  Id.

In addition to generating money for the organization, Irizarry also committed several murders on behalf of the organization.  Id.  One such murder was of Giancarlo Ravasi.  Id.  Irizarry told a crew member that he had to "go do somebody because somebody was testifying in

---

[6] Witnesses testified at Irizarry's trial that on several other occasions, Irizarry encouraged acts of violence or committed acts of violence while collecting unpaid "loans."  Irizarry, 341 F.3d at 280.  On one occasion, Irizarry "bloodied up" an individual in order to receive a loan payment from a third party.  Id.  On another occasion, a crew member testified that after giving Irizarry information on a pizzeria supplier that had not repaid Durso, he saw Irizarry go the supplier's workplace, and shortly thereafter saw the supplier run out of the place, bleeding.  Id.

[7] On a number of occasions, the organization also used arson as a means of generating income.  Irizarry, 341 F.3d at 281.  Irizarry was in charge of burning down designated buildings with the help of fellow crew members.  Id.

[8] Irizarry also discussed other robberies with members of the crew; however, each robbery was called off due to various reasons after Irizarry and his crew "cased" the businesses.  Id.

court against one of his friends." Id.  Shortly thereafter, Irizarry, accompanied by a crew member, located Ravasi, and shot him in the back of the head.  Id.  Irizarry also murdered Joseph Marmora,[9] and his roommate, Antonio Pavone.  Irizarry, 341 F.3d at 282.  Irizarry and another crew member visited Marmora and Pavone in their apartment.  Id.  While at the apartment, Irizarry shot Pavone, while Pavone was praying on the couch, and then shot and stabbed Marmora numerous times.[10]  Id. at 283.

In addition, Irizarry aided in the murder of Kyle Veale ("Veale").  Id.  Veale had borrowed $3,000 from Irizarry and never repaid it.  Id.  As a result, Irizarry took Veale to a local high school and made a crew member shoot Veale.  Id. at 283-84.  Finally, Irizarry is believed to be responsible for the murder of Jose Ruiz, whom Irizarry suspected of burglarizing his apartment.  Irizarry, 341 F.3d at 283-84.  Shortly after Irizarry began suspecting Ruiz, Ruiz's dead body was found near a local high school, two to three miles from where Veale had been shot.  Id.  He had last been seen with Irizarry.[11]  Id.

After Petitioner's trial and sentencing, Petitioner appealed his conviction and sentence. On August 25, 2003, the United States Court of Appeals for the Third Circuit affirmed Petitioner's conviction and sentence.  (Pet'r's Mot. 3.)  Petitioner's subsequent request for a writ of certiorari was denied on January 12, 2004.  (Pet'r's Mot. 3.)  On January 4, 2005, Petitioner

---

[9]At trial, Joseph Marmora was also referred to as "Guiseppe" by Anthony Persichetti.

[10] The autopsy revealed that Marmora had 48 stab and cut wounds on his body.

[11] According to Angelina Francolino, Irizarry's friend, and Elizabeth Griesi, Irizarry's girlfriend at the time, Irizarry later admitted to killing Ruiz.  Id.  He told Griesi, "[n]o spic is going to rob me and I'm going to make an example."  Id.

brought the instant pro se petition, and moved to vacate, set aside or correct his sentence, pursuant to § 2255.  (Pet'r's Mot. 2.)  Petitioner alleges that the charges brought against him violated several statutes including: 18 U.S.C. § 1962(d); 18 U.S.C. § 1962(c) & (2); 21 U.S.C. § 846; 18 U.S.C. § 894; 18 U.S.C. § 841(I)(2); 18 U.S.C. § § 1959(a)(1) & (2); and 18 U.S.C. § § 924(c)(1)(a)(iii) & (2), respectively.  (Pet'r's Mot. 2.)  The Government answered the petition on August 18, 2005.  Petitioner timely responded to the Government's answer.

## LEGAL STANDARD

Pursuant to § 2255, a federal prisoner in custody may file a petition seeking a writ of habeas corpus with the sentencing court on the following grounds: (1) the imposed sentence violated the United States Constitution or laws; (2) the court did not have jurisdiction; (3) the sentence exceeded the maximum allowed by law; or (4) the sentence is subject to collateral attack on other grounds.  See 28 U.S.C. § 2255.  "[A] motion to vacate sentence under 28 U.S.C. § 2255 is addressed to the sound discretion of the district court."  United States v. Williams, 615 F.2d 585, 591 (3d Cir. 1980).  Unless it is conclusively apparent from Petitioner's motion, files, and records that the petitioner is not entitled to relief, the district court must grant the petitioner an evidentiary hearing on the matter.  See id.

Habeas corpus does not encompass all sentencing errors because it is not a substitute for direct appeal.  See United States v. Addonizio, 442 U.S. 178, 184 (1979).  Errors that justify reversal on direct appeal may not necessarily be sufficient to support collateral relief.  See id. at 184.  Where a prisoner fails "to raise his claim on direct review, the writ [of habeas corpus] is available only if the [prisoner] establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"  Reed v. Farley, 512 U.S. 339, 354 (1994) (quoting

6

Wainwright v. Sykes, 433 U.S. 72, 84 (1977)).  Alternatively, collateral relief is available under §

2255 when the alleged error of law constitutes "a fundamental defect which inherently results in

a complete miscarriage of justice."  Addonizio, 442 U.S. at 185.  Thus, the error must be

fundamental and present "exceptional circumstances where the need for the remedy afforded by

the writ of habeas corpus is apparent."  Davis v. United States, 417 U.S. 333, 346 (1974).

## DISCUSSION

Petitioner argues that his sentence of three life terms plus 85 years in prison should be

vacated or modified, because he was deprived of his sixth amendment right to effective

assistance of counsel.[12]  (Pet'r's Motion 2, 5.)  Specifically, Petitioner claims that prior to taking

the stand and testifying, his attorney should have requested a competency hearing on his behalf.

(Pet'r's Mem. 2.)

A petitioner raising an ineffective assistance of counsel claim must satisfy a two-prong

test.  First, the prisoner must establish that "counsel's performance was deficient," i.e., that

"counsel's representation fell below an objective standard of reasonableness."  Strickland v.

Washington, 466 U.S. 668, 687-88 (1984).  Second, a prisoner must show that counsel's

"deficient performance prejudiced the defense."  Id. at 687.  In order to meet the second prong,

the prisoner must establish "that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

reasonable probability exists when the probability is "sufficient to undermine confidence in the

---

[12] The sixth amendment of the Constitution protects the "right [of the accused] to . . .
have the Assistance of Counsel for his defense."  U.S. CONST. amend. VI.  The Supreme Court of
the United States has held that "the right to counsel is the right to the effective assistance of
counsel."  McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).

outcome." Id.  The prisoner has the burden of proof to demonstrate both parts of the test.  See id. at 697.  Failure to prove either part of the test is fatal to the claim.  Id.

Petitioner claims that before allowing him to testify at trial, his attorneys should have petitioned the Court for a hearing assessing Petitioner's competency to stand trial.  (Pet'r's Mem. 2.)  Petitioner claims that the court was correct in stating that he gave "preposterous" stories in his defense.  (Pet'r's Mem. 4.)  He attributes these stories to the fact that he may have been incompetent to stand trial.  (Pet'r's Mem. 4.)  Petitioner further contends that prior to trial, he communicated his mental condition to his attorneys.  (Pet'r's Mem. 4.)  He describes his mental condition as having a bad temper as a result of a "mental disability," developed from complications from his mother's diabetes, which was passed to him in the womb.  (Pet'r's Mem. 4.)  In further support of his mental condition, Petitioner points to the fact that he  received disability income.  (Pet'r's Mem. 4.)  In addition, Petitioner argues that although he advised his attorneys that a previous court sentence had been suspended due to an investigation into his psychiatric history,[13] his attorneys still did not request a competency hearing.  (Pet'r's Mem. 4-5.)

In accordance with Strickland, this Court must consider initially whether "counsel's representation fell below an objective standard of reasonableness" because Petitioner's attorneys did not seek a competency evaluation.  466 U.S. at 687-88.  Failure to seek a competency evaluation or hearing can be considered ineffective assistance of counsel under § 2255.  Jermyn v. Horn, 266 F.3d 257, 300 (3d Cir. 2000).  In Jermyn, the Court stated that:

an attorney would render ineffective assistance of counsel if he or she failed to inquire

_____

[13] According to medical documents submitted by Petitioner, he has been diagnosed with an unspecified psychiatric disorder, and has been prescribed medication for this disorder. (Pet'r's Reply Ex. F.)

into defendant's competency and failed to request a competency hearing, despite indicia
of incompetence that would provide reasonable counsel "reason to doubt" the defendant's
ability to understand the proceedings, communicate with counsel, and assist in his own
defense.

Id.  In order to determine whether counsel's representation was unreasonable, this Court must

first determine whether there was sufficient "indicia of incompetence" for a reasonable attorney

to doubt Petitioner's "ability to understand the proceedings, communicate with counsel, and

assist in his own defense."[14]  Id.  Furthermore, in determining whether counsel was ineffective in

not ordering a competency hearing, this Court "must judge the reasonableness of counsel's

challenged conduct on the facts of the particular case, viewed as of the time of counsel's

conduct."  Jermyn, 266 F.3d at 300.  In addition, the Court "must indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at

302.  The burden is on the petitioner to show otherwise.  Id.

In the instant matter, Petitioner has not met his burden.  Petitioner has failed to

demonstrate that his attorneys were ineffective because they did not request a competency

hearing.  Petitioner merely asserts that a competency hearing should have been granted because

there was "sufficient indicia" to warrant the need for a further investigation into his competency

to stand trial.  (Pet'r's Mem. 7.)  His claim is based soley on his conversations with his attorneys,

and the two supporting documents he provided to them.[15]  (Pet'r's Mem. 4-

---

[14] A petitioner is competent to stand trial if "(1) [he] has the present ability to consult with
[defense counsel] with a reasonable degree of rational understanding and (2) [he] has a rational
as well as factual understanding of the proceedings."  U.S. v. Leggett, 162 F.3d 237, 242 (3d Cir.
1998) (internal quotations omitted).

[15] Although Petitioner provides medical records from Bayonne Medical Hospital as
further documentation of his mental condition in his Reply, these documents are not relevant to
Petitioner's ineffectiveness of counsel claim, because this Court must view counsel's decision

5.)  The first document is an FBI 302 report, which merely reiterates Petitioner's own statements

regarding his mental condition (Pet'r's Mem. 4), and does not contain any substantiated medical

determinations of his condition.  See Langston v. U.S., 105 F. Supp. 2d 419, 423 (E.D. Pa. 2000)

(stating that "if a defendant's mere allegation that she was incompetent to stand trial were enough

to warrant an evidentiary hearing, an evidentiary hearing would be required in every § 2255 case

in which competency was raised") (citing U.S. v. Essing, 10 F.3d 968, 976 (3d Cir. 1993)

(requiring an evidentiary hearing only when petitioner raises an issue of material fact)).

Petitioner also provided a transcript of a prior proceeding[16] in which his sentence was suspended,

pursuant to his enrollment in a mental health program.[17]  (Pet'r's Mem., Ex. 3.)  Due to the

"strong presumption" that counsel's behavior was not ineffective, the transcript's vague

references to Petitioner taking an unidentified medication prescribed by a treating psychiatrist, do

not alone render Petitioner's attorneys ineffective under § 2255.[18]

      More importantly, neither document provides evidence that Petitioner was unable to

assist in his own defense at trial, or that Petitioner did not understand the nature of the

---

"on the facts of the particular case, viewed as of the time of [counsel's] conduct."  Jermyn, 266
F.3d at 300.

[16] On August 19, 1996, Petitioner was indicted for the illegal possession of a weapon by
the State of New Jersey.  (Pet'r's Mem., Ex. 2.)  Petitioner pled guilty to the charges against him
and was sentenced to 180 days in prison and 18 months probation.  (Pet'r's Mem., Ex. 2.)
Petitioner immediately enrolled in a mental health program, which resulted in the suspension of
his sentence.  (Pet'r's Mem., Ex. 2.)

[17] Petitioner's attorneys were also made aware of Petitioner's alleged mental condition
through conversations with his ex-wife, mother, and two brothers.  (Pet'r's Reply, Exs. B-E)

[18] Furthermore, despite Petitioner's claim that he was on anti-psychotic medication,
Petitioner pled guilty to his previous conviction, without claiming insanity or seeking a
competency evaluation.  (Ans. 35-36.)

proceedings against him.  To the contrary, Petitioner demonstrated his competence at trial, and appeared to have a  "present ability to consult with [defense counsel] with a reasonable degree of rational understanding . . . as well as [a] factual understanding of the proceedings" before him. Leggett, 162 F.3d at 242.  For example, on several occasions, Petitioner testified that he had consulted with his attorneys regarding his view of the facts.  (See generally Transcript of Irizarry Trial, attached as Ex. A to Ans. ("Tr. Ex. A"), at 3285-3286.)[19]  In addition, Petitioner stated to the jury that the witnesses who testified against him were lying, and provided the jury with alternative factual scenarios.  (See generally Tr. Ex. A at 3364-3371.)  Petitioner also denied threatening anyone during money collections, and denied knowing that the money he was collecting was from illegal loans.  (See generally Tr. Ex. A at 3291-3293.)  In fact, Petitioner's testimony demonstrated that he was well aware that had he threatened an individual for repayment of a loan, he would have been violating the law.  (See generally Tr. Ex. A at 3291-3293.)  Furthermore, throughout Petitioner's testimony, his attempts to rebut the claims against him were made in an intelligent and calculated manner.  (See generally Tr. Ex. A at 3282-3288.) In sum, at trial, Petitioner clearly possessed "the present ability to consult with [defense counsel] with a reasonable degree of rational understanding," as well as "a rational as well as factual understanding of the proceedings."  Leggett, 162 F.3d at 242.

        Based on the record, this Court cannot conclude that there was reason to doubt Petitioner's competence to stand trial.  Accordingly, this Court cannot conclude that Petitioner's attorneys' decision not to order a competency hearing was unreasonable, as required by the first

_____

        [19] References to Petitioner's trial testimony are based on the original pagination of the trial record.

prong of the Strickland test.  Since a party seeking relief for ineffective assistance of counsel must satisfy each prong of the Strickland test, and Petitioner has not satisfied the first prong, his ineffective assistance of counsel claim necessarily fails.

## CONCLUSION

For the reasons set forth in this Opinion, Petitioner's motion is denied.  It is further decided, pursuant to 28 U.S.C. § 2253(c)(2), that as Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue.


DATED: December 27, 2005

                 S/Joseph A. Greenaway, Jr.            
                 JOSEPH A. GREENAWAY, JR., U.S.D.J.